**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**MICHELLE DOERS,**

    **Plaintiff,**

v.                                                                    Case No.  8:14-cv-3168-T-30AEP

**LINCARE, INC. d/b/a**
**PEDIATRIC SPECIALISTS,**

    **Defendant.**
_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment (Dkt. 33) and Plaintiff's Response in Opposition (Dkt. 39).  The Court, having considered the motion, response, record evidence, and being otherwise advised in the premises, concludes that the motion should be denied with respects to Counts I and II of Plaintiff's Amended Complaint.  The motion is granted with respect to Count III.

## INTRODUCTION

Plaintiff Michelle Doers brought the instant action against her former employer Defendant Lincare, Inc. d/b/a Pediatric Specialists alleging three claims under the Americans with Disabilities Act ("ADA").  Count I alleges that Lincare engaged in a pattern and practice of unlawful discrimination by subjecting Doers to disparate treatment based on her disability.  Count II alleges that Lincare discriminated against Doers on the basis of her

disability or perceived disability by terminating her for pretextual reasons. Count III alleges that Lincare engaged in a pattern and practice of unlawful harassment by subjecting Doers to hostility and ridicule in violation of the ADA.

Lincare moves for summary judgment on all Counts. Lincare's motion with respect to Counts I and II is without merit. Indeed, the record weighs heavily in favor of Doers' version of the facts. The Court grants Lincare's motion with respect to Count III because, even assuming the Eleventh Circuit recognizes a hostile work environment claim under the ADA, the record is insufficient, as a matter of law, to support this claim.

## **BACKGROUND**[1]

Plaintiff Doers has suffered from panic/anxiety disorder since her early twenties.[2] Her anxiety disorder is "always present" and, at its worse, substantially limits her abilities to sleep, think, concentrate, and socialize. When Doers experiences a panic attack, her heart races, she feels dizzy, and she experiences feelings of impending doom, like she is about to lose her mind, or like she is about to die; these symptoms make it difficult for Doers to eat and function normally. The anxiety also affects her digestive system. Doers takes medication to help treat her anxiety. Over time, Doers has developed coping mechanisms to help control her anxiety and related symptoms—one of those coping mechanisms is a

---

[1] The facts are interpreted in a light most favorable to Doers, the non-movant. In light of this standard of review, it is readily apparent that there is ample record evidence in support of Doers' ADA discrimination claims (Counts I and II of her Amended Complaint).

[2] The record reflects that Doers is in her early fifties.

poodle named Stinkbug, Doers' therapy dog.  Stinkbug's presence helps keep Doers calm.  He provides her emotional support.

Doers, who is from Florida, accepted a job at Defendant Lincare as a Center Manager in the Chesapeake, Virginia center.  Lincare is a respiratory company that, among other things, provides durable medical equipment to patients for their respiratory needs.  Lincare's Area Manager Jennifer Maze interviewed and hired Doers on or about September 9, 2009.  As a Center Manager, Doers was responsible for the center's operations, including supervising the other employees located at that center, implementing safety programs, and managing inventory, customer growth, and profitability.  Doers' office included Doers (the Center Manager), a Customer Service Representative, two Respiratory Therapists, a Driver Technician, and a Sales Representative.

Maze was based in Charlotte, North Carolina, and was Doers' direct supervisor during Doers' employment.  After approximately ninety days of employment, Maze completed Doers' "Trial Period Performance Review Manager's Evaluation."  The Review was unequivocally positive: out of four ratings ranging from poor, to excellent, Doers received a rating of "good" on four categories (the second highest rating) and a rating of "excellent" on two categories (the highest rating).  Morever, Maze stated in the additional comment section that Doers was excellent at setting expectations for her staff and managing her staff and that Doers was a great addition to the team and it was a "pleasure" to work with her.

In early February 2010, the unfamiliarity of living in a new place and the harsh winter took a toll on Doers, who was not used to traveling in inclement weather.  Doers also

experienced stress at work associated with Maze's demands and the general demands of working in a stressful environment and, as a result, her anxiety elevated. Doers started experiencing nervousness, racing thoughts, heart palpitations, sleeplessness, and was unable to eat. Doers' anxiety became more difficult for her to manage and she felt like she needed her therapy dog, Stinkbug, to travel with her to help her cope.

Doers had previously established a relationship with Heather W. Moseley, MD to continue her medical plan of care in Virginia, which included the use of the prescription drug Xanax for anxiety and panic. Dr. Moseley provided Doers with a note, dated February 2, 2010, that stated the following: "Mrs. Doers is a patient of mine who I am treating for anxiety. Her pet dog helps her to cope with her anxieties. If possible please allow her to keep her dog with her while traveling. If you have any questions please feel free to call." Doers faxed the note to Maze. According to Doers, she and Maze did not discuss the note in any detail other than to confirm that Maze had received the note.

In early March, a hard freeze hit the area and the roads were icy, creating a travel hazard. Doers' anxiety about driving to work in those conditions compelled her to take Stinkbug with her. Stinkbug slept in his dog bed in her office. Doers' coworkers were aware that Stinkbug was Doers' therapy dog.

On March 3, 2010, Maze called the office to speak to Judy Walker, the Customer Service Representative, and heard a dog barking in the background. Maze inquired about the source of the barking and Walker told her that Doers' therapy dog was barking because there were workers present at the office. Maze then spoke to Doers on the phone and told Doers

that she did not approve of Doers bringing Stinkbug to work. Doers contends that she reminded Maze about Dr. Moseley's note and that Stinkbug was her therapy dog. According to Doers, Maze was dismissive and told Doers that she had to remove Stinkbug from the office.

Later that same day, Maze provided Doers with a Verbal Warning. The memo outlining the verbal warning stated that Doers created an "unprofessional" and "unsanitary" work environment when she brought her dog to work. And "[a]ny additional occurrences" would "result in further disciplinary action up to and including termination." Doers signed the Verbal Warning to acknowledge her receipt of the document. Doers also faxed, for the second time, Dr. Moseley's doctor's note. The Verbal Warning was placed in Doers' personnel file.

Doers contends that Maze began to treat her differently. Maze was demeaning towards Doers and treated her as mentally weak.

Jon Mark Mayes was another Lincare Center Manager who worked at the Winston Salem location during the relevant time. Maze was also his supervisor. In early 2010, Jon Mayes visited Doers' location to offer additional assistance while Doers' Respiratory Therapist was on maternity leave. According to Jon Mayes, Maze made frequent negative comments to him about Doers. Jon Mayes contends that Maze was aware that Doers needed her therapy dog for emotional support. Maze told Jon Mayes that Doers was "crazy" and "needed some help." She made these negative comments about Doers any time that Doers

was discussed—it was "quite often." Maze would roll her eyes when Doers was referenced and say that Doers was "cuckoo."[3]

On March 11, 2010, Maze asked Doers to travel to Florida to cover one of the centers. Doers agreed. Maze made the travel arrangements for Doers and sent her a text message thanking Doers for being a team player. Maze also stated that Doers would not have to pay for her dog as long as she showed the airline the appropriate papers.[4] According to Jon Mayes, while Maze was preparing to send Doers to Florida, she was visiting Mayes' Winston Salem office. Maze made disparaging comments about Doers to Jon Mayes about Doers needing to take her dog with her on the plane.

Later in March, Doers contacted Maze because she wanted to transfer to a lateral position in Florida to live closer to her elderly parents who resided in Florida. Maze was not cooperative and told Doers that she could not recommend Doers in good faith. In fact, Maze informed Doers that she was in the process of working with Human Resources to place Doers on an Action Plan for inadequate performance. Maze refused to provide Doers with any explanation about Doers' alleged poor performance. Maze also had not disciplined, counseled, or even spoken to Doers about any performance deficiencies (other than the Verbal Warning about Stinkbug) prior to this time.

Nonetheless, on April 8, 2010, Maze visited Doers' center and presented Doers with an Action Plan. The first paragraph stated: "This letter will confirm your performance as a

---

[3] Walker also stated that Maze told her Doers was crazy.

[4] Airlines typically do not charge travelers for their pets if the pet is a service animal.

Center Manager is not meeting acceptable standards and that due to serious deficiencies in your work performance; you are being placed on probation." The letter did not include any examples of the referenced deficiencies. Notably, in the section related to interpersonal skills, the letter stated that Doers' staff had reported to Maze that Doers "created an uncomfortable working environment."

According to Doers, when Maze presented her with the Action Plan, Doers asked if she could have a witness present. Maze refused. Doers then asked if someone from Human Resources could be called on the phone to witness their discussion of the Action Plan. Rather than calling Human Resources together as Doers requested, Maze went outside to call Human Resources on her cell phone. Maze then returned to the office and told Doers to pack her belongings and go home. Doers contends that she never raised her voice during this time. The next day, Doers was informed that she was terminated.

About a week later, Doers received a letter from Maze stating that her termination was "due to [her] insubordinate behavior toward [Maze] as [Doers'] supervisor" and that Doers' "belligerent behavior" was "so out of control" that it was necessary to ask Doers to leave and terminate her "effective immediately." According to Walker, who was in the office on April 8, 2010, Doers did not scream at Maze or raise her voice. According to Jon Mayes, who took over Doers' center after she was fired, the two people present at the center on the day that Maze fired Doers informed him that Doers "was not screaming or yelling" and Doers "was not disrespectful to [Maze]."

The record includes sworn statements from virtually every individual that directly reported to Doers at the center during the relevant time. The evidence reflects that Doers' staff worked very cooperatively with each other. They had no complaints about Doers. And they never heard any coworker suggest that Doers was creating an uncomfortable work environment. To the contrary, Doers was described as having a great work ethic, being calm and level-headed, being truly dedicated to the job, being an easy person to work with, and that the center became a better team environment the longer Doers worked there.

In stark contrast, virtually every individual that worked for Maze that provided sworn testimony in this case indicated that they did not like Maze, did not respect Maze, thought Maze was sneaky, thought Maze was dishonest, and viewed Maze as a mean person. It is undisputed in the record that Maze never informed Employee Relations or Human Resources about Doers' request to have her therapy dog accompany her while traveling. This is in violation of Lincare's policy.

Lincare moves for summary judgment on all of Doers' claims in this case. Lincare argues the following: Doers cannot establish that she is a qualified individual with a disability; Doers never notified Lincare of her alleged disability; Doers has no evidence that Lincare perceived her to be disabled; and Lincare did not subject Doers to harassment or discrimination based on any purported disability.

## **SUMMARY JUDGMENT STANDARD**

Motions for summary judgment should be granted only when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id.* Throughout this analysis, the court must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Id.* at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49 (1986).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248;

*Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## DISCUSSION

### I.     Doers' Disparate Treatment Claims under the ADA

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). In order to establish a prima facie case of discrimination under the ADA, a plaintiff has the burden at trial to show: (1) that she is disabled; (2) that she is a qualified individual; and (3) that she was subjected to unlawful discrimination because of her disability. *See Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). Disability discrimination may be proven through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework. *See Raytheon Co. v. Hernandez,* 540 U.S. 44, 49-50 & n. 3 (2003).

### A.     Lincare's Argument that Doers Was Not "Disabled"

"Disability" is defined under the ADA as "a physical or mental impairment that substantially limits one or more major life activities," having a "record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A)-(C). The ADA provides a nonexhaustive list of major life activities, including "speaking," "concentrating," "thinking," "communicating," "sleeping," "breathing," and "working." *Id.*

at § 12102(2)(A).  The EEOC has also identified "interacting with others" as a major life activity.  29 C.F.R. § 1630.2(i)(1)(i).  With respect to being regarded as disabled, an individual can establish this factor "because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*."  42 U.S.C. § 12102(3) (emphasis added).

In 2008, Congress broadened the definition of "disability" by enacting the ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553.  *Mazzeo,* 746 F.3d at 1268.  The ADA Amendments Act (ADAAA) was intended to make it "easier for people with disabilities to obtain protection under the ADA."  29 C.F.R. § 1630.1(c)(4).  The regulation clarifies that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability."  *Id.*  "[T]he question of whether an individual meets the definition of disability . . . should not demand extensive analysis."  *Id.*; Pub.L. No. 110-325, § 2(b)(5) (2008).

Here, Doers points to ample evidence that could allow a jury to find that she is disabled under the ADA.  Doers has suffered from anxiety and panic disorder for approximately thirty years.  She receives medical treatment for her anxiety disorder.  When her anxiety is at its worse it impacts her ability to sleep, concentrate, and socialize.  It also adversely affects her digestive system.  During her employment at Lincare, Doers' anxiety worsened, which is why she received the note from Dr. Moseley requesting that Doers' therapy dog travel with her.

And even if Doers did not have any evidence in support of her disability, the record reflects a genuine issue of fact with respect to Maze regarding Doers as disabled. The record reflects that Doers provided Maze with Dr. Moseley's note regarding her anxiety more than one time, Maze referenced Doers' therapy dog when she made the travel arrangements to send Doers to Florida, and Maze made numerous disparaging comments about Doers' use of her therapy dog as emotional support, such as labeling Doers as cuckoo, crazy, and needing help. According to Doers, Maze also started to treat her as mentally weak. Accordingly, Lincare's motion is denied with respect to the issue of whether Doers was disabled under the ADA.[5]

### B. Lincare's Argument that Doers Was Not Qualified

Lincare attempts to argue that Doers was not qualified for her job as a matter of law. The Court disagrees. The record reflects that Maze's initial evaluation of Doers' performance was extremely positive. In fact, there is no evidence reflecting poor performance on Doers' part other than the Action Plan, the contents of which are greatly contested in the record. Doers' coworkers testified that Doers was a good manager. Jon Mayes stated that Doers was truly dedicated to her job and had a great work ethic. Accordingly, Lincare's motion is denied with respect to this issue.

---

[5] This evidence also belies Lincare's argument that it was unaware that Doers was disabled.

### C. Lincare's Argument that Doers' Termination Was Not Based on Any Disability

Lincare argues that Doers has not presented any evidence that her termination "had anything to do with her alleged disability." The Court disagrees. If a plaintiff establishes a prima facie case using circumstantial evidence, the burden then shifts to the employer to "articulate some legitimate, non-discriminatory reason" for the employment action. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the employer articulates a non-discriminatory reason, the burden shifts to the plaintiff, who "must meet that reason head on and rebut it." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotations omitted). The plaintiff, in other words, must show that the proffered explanation is pretext for discrimination. *Id.* Merely challenging the wisdom of an employer's reason is not enough. *Id.* The plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. State of Ala. State Tenure Com'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotations omitted).

Lincare argues that Doers was terminated because she was disrespectful, insubordinate, and inappropriate toward Maze; this argument is contradicted to such a great extent in the record that it deserves no further attention. As detailed under the Background section of this Order, Maze's version of the facts are heavily disputed. Simply put, there is more than ample evidence of "weaknesses, implausibilities, inconsistencies, and

contradictions" in Lincare's proffered legitimate reason for the termination. And there is also sufficient evidence that the *real* reason behind the termination was due to Doers' disability. Lincare's arguments on these points are, at best, mistaken. Accordingly, Lincare's motion is denied with respect to Counts I and II.[6]

## II.     Doers' Hostile Work Environment Claim under the ADA

Count III of Doers' Amended Complaint alleges that Lincare engaged in a pattern and practice of unlawful harassment by subjecting Doers to hostility and ridicule in violation of the ADA on the basis of her disability and perceived disability. Even assuming a hostile work environment claim is tenable under the ADA, the record is insufficient to establish a "severe or pervasive" work environment.[7]

An ADA hostile work environment claim is governed by the same standards as a Title VII claim. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582-83 (11th Cir. 2000). Accordingly, a prima facie case requires a plaintiff to establish that (1) she was disabled as defined by the law; (2) she was subject to unwelcome conduct; (3) the harassment was based

---

[6] Lincare's argument that, to the extent Doers requested an accommodation, Lincare reasonably accommodated her is so heavily disputed in the record that it also deserves no further discussion. Indeed, under Doers' version of the facts, she informed Lincare that she needed to travel with her dog to help treat her anxiety and, after being informed of this accommodation request, Lincare provided her with a verbal warning and threatened future discipline, including termination, for any "additional occurrences" of taking her dog to work. It is axiomatic that, at this stage, any inferences must be construed in Doers' favor.

[7] The Eleventh Circuit "has never held in a published opinion that a claim for harassment or a hostile work environment is available under the ADA." *Palmer v. Albertson's LLC*, 418 F. App'x 885, 889 (11th Cir. 2011).

on the disability; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) a basis for holding the employer liable. *Id.*

According to the Eleventh Circuit, it is the fourth element "that tests the mettle of most [hostile environment] harassment claims." *Id.* at 583. It has both an objective and subjective component. *Gowski v. Peake*, 682 F.3d at 1299, 1311-12 (11th Cir. 2012). The plaintiff must "subjectively perceive" the harassment as severe enough to change the terms of her employment, and the harassment must result in an environment that a reasonable person would find hostile or abusive. *Id.* In evaluating the objective component, courts should consider all the circumstances surrounding the retaliatory conduct, to include its frequency and severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's job performance. *Id.*

Throughout this inquiry, courts must remain mindful that the "standards for judging hostility are sufficiently demanding to ensure that [a proscription against hostile work environments] does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted). To that end, "conduct must be extreme to amount to a change in the terms and conditions of employment." The workplace must be "permeated with discriminatory intimidation, ridicule, and insult." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted).

Simple teasing, offhand comments, and isolated incidents do not suffice. *Id; see e.g.*, *Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1254-56 (11th Cir. 2014). "Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place."

*McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) (internal quotations omitted).

Here, the facts, construed in the light most favorable to Doers, do not satisfy the critical fourth element. Doers testified that she performed at a high level throughout her employment. And the disparaging comments that Maze stated to Doers' coworkers about Doers being "cuckoo," "crazy," and needing her therapy dog's help to cope, while distasteful and unpleasant, are not severe and pervasive as a matter of law to establish a hostile work environment. Accordingly, Lincare's motion is granted with respect to Count III.

It is therefore **ORDERED AND ADJUDGED** that:

1. Defendant's Motion for Summary Judgment (Dkt. 33) is denied with respect to Counts I and II of Plaintiff's Amended Complaint and granted with respect to Count III of Plaintiff's Amended Complaint.

2. The Court defers entry of final judgment in Defendant's favor as to Count III of Plaintiff's Amended Complaint until the conclusion of this case.

**DONE** and **ORDERED** in Tampa, Florida on March 4, 2016.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2014\14-cv-3168.msj33-ADA-anxiety-deny.wpd